**17 MAG 1927** ORIGINAL

Approved: _____
KIERSTEN A. FLETCHER/ROBERT B. SOBELMAN
Assistant United States Attorneys

U.S. DISTRICT COURT
FILED
MAR 16 2017
S.D. OF N.Y.

Before:   THE HONORABLE BARBARA C. MOSES
          United States Magistrate Judge
          Southern District of New York

- - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA          :     **SEALED COMPLAINT**

        - v. -                    :     Violations of 18 U.S.C.
                                        §§ 1349 and 1956(h)
                                  :
ARASH KETABCHI,                   :     COUNTY OF OFFENSE:
      a/k/a "Zach Peterson,"            NEW YORK
ANDREW OWIMRIN                    :
      a/k/a "Andrew Owens,"
      a/k/a "Jonathan Stewart,"   :
WILLIAM SINCLAIR,
MICHAEL FINOCCHIARO,              :
      a/k/a "Michael Foster,"
ARIEL PERALTA, and               :
JOSEPH McGOWAN,
                                  :
                Defendants.
                                  :

- - - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

        CHRISTOPHER BASTOS, being duly sworn, deposes and says
that he is a Detective with the New York City Police Department
and a Task Force Officer with the Department of Homeland
Security – Homeland Security Investigations, and charges as
follows:

COUNT ONE
(Conspiracy to Commit Wire Fraud)

        1.    From at least in or about October 2013 up to and
including at least in or about September 2016, in the Southern
District of New York and elsewhere, ARASH KETABCHI, a/k/a "Zach
Peterson," ANDREW OWIMRIN, a/k/a "Andrew Owens," a/k/a "Jonathan
Stewart," WILLIAM SINCLAIR, MICHAEL FINOCCHIARO, a/k/a "Michael
Foster," ARIEL PERALTA, and JOSEPH McGOWAN, the defendants, and
others known and unknown, willfully and knowingly, did combine,

conspire, confederate, and agree together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

2.    It was a part and object of the conspiracy that ARASH KETABCHI, a/k/a "Zach Peterson," ANDREW OWIMRIN, a/k/a "Andrew Owens," a/k/a "Jonathan Stewart," WILLIAM SINCLAIR, MICHAEL FINOCCHIARO, a/k/a "Michael Foster," ARIEL PERALTA, and JOSEPH McGOWAN, the defendants, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

(Title 18, United States Code, Section 1349.)

## COUNT TWO
(Conspiracy to Commit Money Laundering)

3.    From at least in or about October 2013 through in or about December 2016, in the Southern District of New York and elsewhere, ARASH KETABCHI, a/k/a "Zach Peterson," ANDREW OWIMRIN, a/k/a "Andrew Owens," a/k/a "Jonathan Stewart," WILLIAM SINCLAIR, MICHAEL FINOCCHIARO, a/k/a "Michael Foster," ARIEL PERALTA, and JOSEPH McGOWAN, the defendants,  the defendants, and others known and unknown, intentionally and knowingly did combine, conspire, confederate, and agree together and with each other to violate Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 1957(a).

4.    It was a part and an object of the conspiracy that ARASH KETABCHI, a/k/a "Zach Peterson,"  ANDREW OWIMRIN, a/k/a "Andrew Owens," a/k/a "Jonathan Stewart," WILLIAM SINCLAIR, MICHAEL FINOCCHIARO, a/k/a "Michael Foster," ARIEL PERALTA, and JOSEPH McGOWAN, the defendants, and others known and unknown, in an offense involving and affecting interstate and foreign commerce, knowing that the property involved in certain financial transactions, to wit, cash transactions and wire transfers, represented the proceeds of some form of unlawful activity, would and did conduct and attempt to conduct such financial transactions which in fact involved the proceeds of specified unlawful activity, to wit, wire fraud and wire

fraud conspiracy, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of said specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

5.    It was a further part and an object of the conspiracy that ARASH KETABCHI, a/k/a "Zach Peterson," ANDREW OWIMRIN, a/k/a "Andrew Owens," a/k/a "Jonathan Stewart," WILLIAM SINCLAIR, MICHAEL FINOCCHIARO, a/k/a "Michael Foster," ARIEL PERALTA, and JOSEPH McGOWAN, the defendants, and others known and unknown, within the United States, in an offense involving and affecting interstate and foreign commerce, knowingly would and did engage and attempt to engage in monetary transactions in criminally derived property of a value greater than $10,000 that was derived from specified unlawful activity, to wit, wire fraud and wire fraud conspiracy, in violation of Title 18, United States Code, Section 1957(a).

(Title 18, United States Code, Section 1956(h).)

The bases for my knowledge of the foregoing charges are, in part, as follows:

6.    I am a Detective with the New York City Police Department ("NYPD") and a Task Force Officer with the Department of Homeland Security – Homeland Security Investigations ("HSI"). My duties and responsibilities include the investigation of fraud offenses including wire fraud, bank fraud, and money laundering.  The information contained in this affidavit is based upon my personal knowledge and my review of documents and records gathered during the course of this investigation, as well as information obtained, directly or indirectly, from other sources.  Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all of the facts that I have learned during the course of the investigation.  Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

Overview of the Scheme

7.    In recent months, the NYPD and HSI have been investigating a group of telemarketing companies (the "Telemarketing Companies") that operate a fraudulent scheme (the "Telemarketing Scheme"), by which they promise to earn victims (the "Victims") money in exchange for the Victim making an

initial cash investment in business development, website design, grant applications, or tax preparation services. Instead, the Victims receive only online pamphlets and so-called "coaching sessions" but do not earn any of the promised returns.

       8.    Based on the NYPD and HSI investigation, and as set forth in greater detail below, ARASH KETABCHI, a/k/a "Zach Peterson," ANDREW OWIMRIN, a/k/a "Andrew Owens," a/k/a "Jonathan Stewart," WILLIAM SINCLAIR, MICHAEL FINOCCHIARO, a/k/a "Michael Foster," ARIEL PERALTA, and JOSEPH McGOWAN, the defendants, have participated in the Telemarketing Scheme by, among other things, operating the interrelated Telemarketing Companies as set forth in the below chart:

| Telemarketing Company | Defendants |
|---|---|
| A1 Business Consultants ("A1")<br><br>Element Business Services ("Element")<br><br>Elevated Business Consultants ("Elevated") | Arash Ketabchi, a/k/a "Zach Peterson"<br><br>Andrew Owimrin, a/k/a "Andrew Owens," a/k/a "Jonathan Stewart"[1] |
| Olive Branch Marketing ("Olive Branch")<br><br>Paramount Business Solutions ("Paramount") | William Sinclair<br><br>Michael Finocchiaro, a/k/a "Michael Foster" |
| Carlyle Management Group ("Carlyle") | Ariel Peralta |
| Vanguard Business Solutions ("Vanguard") | Joseph McGowan |

---

[1]    Based on my review of an October 6, 2014 email, see infra n.2, subject "Salesman List," it appears that certain employees of Olive Branch and A1, including KETABCHI and OWIMRIN, use aliases to communicate with Victims. According to the email, ARASH KETABCHI is "Zach Peterson" and OWIMRIN is "Andrew Owens." See also infra ¶ 14(e).

a.   The Telemarketing Companies defrauded various Victims by, among other things, promising the Victims that they will earn money through a simple cash investment. Victims spoke with KETABCHI and OWIMRIN, see infra ¶¶ 14(a), 14(e), 15(d), and both KETABCHI and OWIMRIN received hundreds of thousands of dollars from their unsuspecting Victims, see infra ¶¶ 11(c), 13(b), 14(c). KETABCHI convinced one Victim to invest $149,000 in his company, A1, but that Victim did not earn any of the promised returns. See infra ¶ 14(d). When Victims of the Telemarketing Scheme sought refunds, or fought credit card charges, the Telemarketing Companies provided explanations and documentation to the credit card companies falsely representing that the Victims had received the promised services. See infra ¶¶ 15, 19.

b.   SINCLAIR and FINOCCHIARO operated different companies – Olive Branch and Paramount – but the scheme was the same:  SINCLAIR and FINOCCHIARO contacted Victims, made them false promises, and took the Victims' money. See infra ¶¶ 17, 18.  FINOCCHIARO and SINCLAIR then fought customer claims for refunds with KETABCHI. See infra ¶ 19.

c.   Victims were also defrauded by representatives of Carlyle and Vanguard, run by PERALTA and McGOWAN. See infra ¶¶ 22, 26-27, 32. PERALTA received over a hundred thousand dollars in Victim checks, much of which he shared with McGOWAN. See infra ¶¶ 29-31.  The Telemarketing Companies accomplished this scheme by working together, selling each other lead lists, and sharing the profits of the fraud. See infra ¶¶ 21, 33.

### Victim Interviews

9.   Based on my interviews of more than 30 Victims (the "Victim Interviews") and my participation in this investigation, I have learned, in substance and in part, the following:

a.   Each Victim was first contacted via phone by a representative of one of the Telemarketing Companies, who offered the Victim an opportunity to earn money by making a cash investment.  The Victims were each promised they would make money through marketing websites that would be created for them, in some cases even though the Victim did not own or know how to operate a computer, and without needing to do anything apart from making that initial cash investment.

b.    Many Victims, the majority of whom are over 70 years old, invested thousands of dollars with the Telemarketing Companies, typically in the form of (1) a check drawn on the Victim's bank account, or (2) a cash advance against a credit card the Victim opened following the suggestion of the Telemarketing Companies.

c.    After making the initial investment, each of the Victims received repeated phone calls and emails from different Telemarketing Companies offering "coaching" or marketing services, and seeking additional investments purportedly to support the Victims' own businesses, tax preparation and business development services, and, eventually, debt relief services.

d.    None of the Victims earned the investment returns they were promised.  When Victims called to inquire with the Telemarketing Companies regarding their promised investment returns, the Victims were directed to managers who did not answer the Victims' calls, told the Victims they needed to invest more money, or promised to follow up with a particular Victim at a later time and never did so.

e.    Certain Victims, and multiple customers of the Telemarketing Companies, have filed claims with their credit card companies disputing charges imposed by the Telemarketing Companies, and have alleged in their claims that: (1) the Telemarketing Companies did not provide the services promised, and/or (2) that the Telemarking Companies defrauded the customer into authorizing the credit card charges.

## Operation of the Telemarketing Scheme

10.    Based upon my review of publicly available information, my review of email communications[2] involving the

---

[2]    Unless otherwise specified herein, any email communication referenced in this Complaint was obtained pursuant to a judicially authorized search warrant. Where this Complaint indicates a particular defendant to be the author of an email, that indication is based on one or more of the following: (1) the presence of some or all of that defendant's name in the "From" field of the email (such as "Bill S" for WILLIAM SINCLAIR, the defendant, or "ketabchi.arash" for ARASH KETABCHI, the defendant), (2) the presence of some or all of a defendant's name at the bottom of the email indicating who signed the email, or (3) an indication in the text of an email as to the identity

defendants, and my participation in this investigation, I have learned among other things, the following:

     a.    The Telemarketing Companies are separate, but interrelated entities, many of which are owned and operated by ARASH KETABCHI, a/k/a "Zach Peterson," the defendant, and WILLIAM SINCLAIR, the defendant, both of whom are former employees of Manhattan Professional Group d/b/a "The Tax Club," a Manhattan-based telemarketing entity that offered tax preparation services to customers until it was disbanded following a Federal Trade Commission enforcement action in 2012.

     b.    To perpetrate the Telemarketing Scheme, the Telemarketing Companies use lists of potential victims or "leads" (the "Lead Lists"), which the Telemarketing Companies sell to each other.  In general, a purchaser of a Lead List pays the seller (1) an up-front fee for the Lead List itself, and (2) a royalty payment in the event that the purchaser of the Lead List is able to sell a product or service to a customer on the Lead List (the "Royalty Payment").

     c.    Employees of the Telemarketing Companies refer to victim claims for refunds as "chargebacks" or "chargeback disputes" (the "Chargebacks") and discuss how to "save" the Chargeback (by convincing the customers to continue with the investment and withdraw their claims), or to "beat" the Chargeback (by providing documentation to the credit card company supporting the charge).[3]

     d.    If a Telemarketing Company loses a Chargeback, the victim's credit card charge is reversed, causing the Telemarketing Company to lose not only the funds from that sale, but any associated Royalty Payment in the event the

---

of the drafter of the email, such as in the email described infra ¶ 19.

[3]    The Telemarketing Companies often asked Victims to sign contracts (the "Contracts"), which the Telemarketing Companies later submitted to credit card companies in an effort to fight the Chargeback by showing that the Victims received services. The Contracts did not, however, reflect the promises that has been made to Victims regarding investment returns, and made only vague representations about "Corp/LCC" and "BizOpp" services, to name some examples.  When Victims did not sign the proffered Contracts – as was often the case – the Telemarketing Companies had difficulty fighting the Chargebacks.  See infra ¶ 20(d).

company that sold the Telemarketing Company the Lead List is not willing to refund the Royalty Payment.  In addition, when the Telemarketing Company loses a certain percentage of the Chargebacks relative to its respective sales volume, the Telemarketing Company runs the risk of having its Merchant Account closed by the credit card processors due to excessive claims of fraud and/or other customer complaints.  This can inhibit the Telemarketing Company's ability to accept future credit card payments from Victims and to further continue the fraudulent scheme.

### A1 Business Consultants, Element Business Services, and Elevated Business Consultants

11.   Based upon my review of records obtained from Bank of America and Capital One, I have learned, among other things, the following regarding accounts during the time period of the allegations set forth herein:

a.   ARASH KETABCHI, a/k/a "Zach Peterson," the defendant, was the sole signatory on four bank accounts registered to A1 Business Consultants, that is, a Bank of America account ending in -0630 (the "A1 Bank of America 0630 Account"), a Bank of America account ending in -2346 (the "A1 Bank of America 2346 Account"), a Capital One account ending in -0445 (the "A1 Capital One 0445 Account"), and a Capital One account ending in -1253 (the "A1 Capital One 1253 Account" and, collectively the "A1 Accounts").

b.   KETABCHI also was the sole signatory on two bank accounts registered to Elevated Business Consultants, that is, a Wells Fargo account ending in -4082 (the "Elevated Wells Fargo 4082 Account") and a Wells Fargo account ending in -4090 (the "Elevated Wells Fargo 4090 Account," and, collectively, the "Elevated Accounts").[4]

c.   From at least on or about February 2016 to at least on or about July 2016, the Elevated Accounts transferred approximately $228,000 to the A1 Accounts.

d.   From at least in or about March 2016 through at least in or about August 2016, the Elevated Accounts also

---

[4]   Based upon my review of records from the Elevated Accounts, it appears that the Elevated Accounts also were used to receive Victim funds.

received over $60,000 in transfers from accounts held in the name of Carlyle, the apparently fraudulent activities of which are set forth in greater detail infra ¶¶ 21-28.

e.    From at least in or about October 2015 through at least in or about April 2016, approximately $37,000 in checks were drawn on the A1 Accounts and deposited into accounts held in the name of ANDREW OWIMRIN, the defendant.

f.    ANDREW OWIMRIN, the defendant, and a co-conspirator not charged herein ("CC-1") were the signatories on a bank account registered to Element, that is, a Bank of America account ending in -3770 (the "Element Account").

g.    From at least in or about January 2015 through at least in or about March 2015 approximately $18,950 in wire transfers were made from the Element Account to the A1 Accounts.

12.    Based upon my review of email communications involving ARASH KETABCHI and ANDREW OWIMRIN, the defendants, I have learned, among other things, the following:

a.    In or about October 2015, KETABCHI received login credentials for A1 and Element from a credit card processing company called "APS." Based on my participation in this investigation, I believe these credentials could be used to access the A1 and Element merchant accounts serviced by APS. KETABCHI forwarded those credentials to OWIMRIN and two co-conspirators not charged herein ("CC-2" and "CC-3").

b.    On or about January 21, 2016, KETABCHI received a lead for a woman who was described as "55 … either divorced or has never been married, and has a rather large trust fund." KETABCHI forwarded that lead to OWIMRIN and CC-2. KETABCHI forwarded similar leads to OWIMRIN and CC-2 on other dates in December 2015.  Based upon my participation in this investigation, I believe KETABCHI forwarded this information to OWIMRIN and CC-2 so OWIMRIN and CC-2 could call these individuals and try to get them to invest.

13.    Based upon my interview with an A1 Victim ("Victim-1"), I have learned, among other things, the following:

a.    Victim-1 was contacted via phone by a representative of A1 regarding a potential investment in or around the middle of 2014.

b.   Victim-1 initially invested $9,697 with A1, and invested more than $60,000 over time with several Telemarketing Companies, including by charging investments to Victim-1's credit cards.

14.   Based on my interview with another Victim of A1 ("Victim-2"), I have learned, in substance and in part, the following:

a.   Victim-2 was contacted by an individual who identified himself as "Zach Peterson."  As set forth supra ¶ 8 n.1, "Zach Peterson" appears to be an alias used by ARASH KETABCHI, the defendant.

b.   Victim-2 initially made a cash investment with A1 in the amount of $18,999.

c.   "Peterson" offered Victim-2 a 20% equity stake in A1 for a total investment of $149,000.  Victim-2 agreed, and Victim-2's check for $149,000 was deposited into the A1 Capital One 1253 Account on or about February 5, 2016.

d.   Victim-2 has tried to communicate with "Peterson" since Victim-2's "investment," but has not received any response, or any returns from the investment in A1.

e.   Victim-2 also spoke with an individual named "Jonathan Stewart" at A1.  During one of the Victim Interviews, Victim-2 provided me with the phone number Victim-2 had for "Jonathan Stewart."  Based upon my review of records received from Sprint, I have learned that the subscriber listed for the "Jonathan Stewart" phone number is ANDREW OWIMRIN, the defendant.

15.   Based on my interview with another Victim of A1 ("Victim-3"), and my review of documents provided to me by Victim-3, I have learned, in substance and in part, the following:

a.   Victim-3 was contacted by "Jonathan" at A1 about investing in a home-based business.

b.   In or about October 2015, Victim-3 agreed to pay A1 $20,000 to invest in that business, and made payments via several credit cards, including Discover.

c.   In or about November 2015, Victim-3 initiated a Chargeback with Discover in which Victim-3 indicated A1 did not provide the services it promised.

d.   In response to Victim-3's Chargeback, A1 submitted documentation to Discover misrepresenting the substance of the promises made to Vicim-3 in an effort to fight the Chargeback.   The documentation provided by A1 was signed by KETABCHI, and indicated that Discover could direct any questions regarding the Chargeback to CC-3.

<u>Olive Branch Marketing and Paramount Business Solutions</u>

16.   Based upon my review of records obtained from Bank of America and Capital One, including video surveillance, I have learned, among other things, the following regarding accounts during the time period of the allegations set forth herein:

a.   WILLIAM SINCLAIR, the defendant, was the sole signatory on two bank accounts registered to Olive Branch, that is, a Bank of America account ending in -6913 (the "Olive Branch Bank of America 6913 Account") and a Bank of America account ending in -6926 (the "Olive Branch Bank of America 6926 Account"), and SINCLAIR and MICHAEL FINOCCHIARO, the defendant, were joint signatories on one bank account registered to Olive Branch Marketing, that is, a Bank of America account ending in -7271 (the "Olive Branch Bank of America 7271 Account" and, collectively "the Olive Branch Accounts").

b.   SINCLAIR and FINOCCHIARO are also joint signatories on one bank account registered to Paramount, that is, a Bank of America account ending in -4639 (the "Paramount Account").

c.   From at least in or about March 2014 through at least in or about December 2014, the Olive Branch Accounts transferred over $340,000 to the Paramount Account.   In addition, over the same time period, the Paramount Account transferred over $960,000 to the various Olive Branch Accounts.

17.   Based upon my participation in an interview with an Olive Branch and Paramount Victim ("Victim-4"), my review of documents provided by Victim-4, and my participation in this investigation, I have learned, among other things, the following:

a.   Victim-4 was first contacted in or around April 2014 by WILLIAM SINCLAIR, the defendant.  SINCLAIR stated that he was affiliated with Olive Branch.

b.   Victim-4 also spoke to "Zach Peterson" and "Andrew Owens" on behalf of Olive Branch, who, as set forth supra ¶ 8 n.1, appear to be ARASH KETABCHI and ANDREW OWIMRIN, the defendants.

c.   Victim-4 invested approximately $3,000 each with Olive Branch and Paramount. Despite the representations made to Victim-4, Victim-4 did not receive any investment returns from Olive Branch or Paramount.

d.   Victim-4 kept investing money with multiple companies because the companies told Victim-4 that it was necessary to invest more money to build up the business before Victim-4 could earn any money.

18.   Based upon my participation in an interview with a second Olive Branch Victim ("Victim-5") and my participation in this investigation, I have learned, among other things, the following:

a.   Victim-5 was first contacted in approximately 2013 by WILLIAM SINCLAIR, the defendant.

b.   In and around October 2013, Victim-5 agreed to invest with Olive Branch.  Victim-5 wrote Olive Branch checks totaling approximately $16,000, which were each deposited into the Olive Branch Bank of America 7271 Account.

19.   Based upon my review of email communications between WILLIAM SINCLAIR and MICHAEL FINOCCHIARO, the defendants, as well as my participation in other Victim Interviews, it appears that SINCLAIR and FINOCCHIARO operated Olive Branch and Paramount until at least 2015. Based upon my review of these email communications, I have learned, in substance and in part, the following:

a.   Throughout 2014 and 2015, SINCLAIR, FINOCCHIARO, and a co-conspirator not charged herein ("CC-4") communicated regularly with and regarding Olive Branch, Paramount and Victims' Chargebacks.

b.   On or about March 29, 2014, an email was sent to credit card processing company from an email address

which indicated in the "From" field that it was from "Michael Foster" at Paramount (the "Paramount Email Account").  The body of the email included, among other things, the statement, "this is Michael Finocchiaro at Paramount Business Solutions. I work with Bill Sinclair of Olive Branch Marketing."

c.   On or about July 30, 2014, the Paramount Email Account sent an email to a victim regarding a Chargeback, indicating that the victim's credit card statement "show[ed] our subsidiary company, Olive Branch Marketing."  The email went on to note that "this dispute needs to be dropped with your credit card immediately as you did give us your authorization for each investment."  The email was signed by "Bill Sinclair/President, Paramount Business Solutions."

d.   On or about August 20, 2014, FINOCCHIARO received an email which read, part, "Thank you for your recent application for a merchant account … we regret that we are unable to approve your application at this time for the following reason(s): Merchant account risk level too high for approval."  Based on my participation in this investigation, my review of email communications, and my training and experience, I have learned that a merchant account is "high risk" where there is a high incidence of Chargebacks, and believe that FINOCCHIARO's application for a merchant account was likely rejected due to the likely high incidence of Chargebacks at Paramount and Olive Branch.

e.   On or about November 27, 2014, CC-4 emailed SINCLAIR and FINOCCHIARO enclosing an email from a Victim regarding a Chargeback submitted in October 2014, in part, "Messages like this need an assassin's mentality to deal with the client and move on.  This is the stage 5 clinger that cries rape.  She's got 3 (4 total) other charges with this sale that will also manifest into charge backs."  Based upon my training, experience, and participation in this investigation, I believe CC-4 was telling SINCLAIR and FINOCCHIARO in this email that they need to deal with victims swiftly when the victims enter into Chargebacks, because, if they do not, the victims will only become more convinced that the Telemarketing Companies were perpetrating a scam and seek to Chargeback all of their charges.

20.   Based upon my review of email communications between WILLIAM SINCLAIR and MICHAEL FINOCCHIARO, the defendants, I have learned, among other things, the following:

a.   SINCLAIR, FINOCCHIARO, and CC-3 communicate over email regarding how Chargebacks affect their ability to maintain merchant accounts to process credit card payments, and the possible consequences to the operation of their business from excessive chargebacks.

b.   For example, on or about October 21, 2015, CC-3 emailed SINCLAIR, copying ARASH KETABCHI, the defendant, in part, "Bill, We received a chargeback that is on your timeline. Can you please deposit the funds in the account ending in 2346 today." Based upon my training, experience, and my participation in this investigation, it appears that CC-3 was asking SINCLAIR to deposit funds in the A1 Bank of America 2346 Account soon to cover the potential Chargeback and avoid affecting the viability of the merchant account.

c.   On or about November 9, 2015, CC-3 emailed SINCLAIR requesting a sales contract for a customer sale, to which SINCLAIR responded, "Arash and I discussed this and as soon as the $2000 CB hit the element checking account he was going to close it out." Based upon my training, experience and my participation in this investigation, it appears that SINCLAIR is indicating that as soon as the chargeback was reflected in the Element Account, KETABCHI would close the Element Account.

d.   In a December 2015 email exchange, SINCLAIR, KETABCHI, and CC-3 discussed a chargeback for an Element Victim, the fact that the Element Victim had not signed a Contract, and how it affected Element's merchant account. In this email chain, SINCLAIR told KETABCHI that his role was to "broker[] leads" for Element and that he used the Element merchant account "like [his] own." SINCLAIR also told KETABCHI, "you thought I was bullshitting when I used to complain about all the cb's we got. Now you see how bad it gets." Based upon my training, experience, and participation in this investigation, it appears that SINCLAIR was telling KETABCHI that he used the Element merchant account to process Victim payments, and that he did so in a manner aimed to prevent "cb's," which I understand to mean Chargebacks, and that KETABCHI would have difficulty fighting the Chargeback because the Victim did not sign the Contract.

21.   Based upon my review of records from TD Bank, Capital One, Wells Fargo and Bank of America, Olive Branch appears to have a financial partnership with A1 and Element. The records reflect, among other things, the following:

a.   From at least in or about April 2014 through at least in or about October 2015, Olive Branch transferred over $300,000 to the A1 Accounts.

b.   From at least in or about January 2015 through at least in or about January 2016, the A1 Accounts transferred over $600,000 to the Olive Branch Accounts.

c.   From at least in or about July 2015 through at least in or about September 2015, Element transferred over $50,000 to the Olive Branch Accounts.

Carlyle Management Group and Vanguard Business Consultants

22.   Based upon my review of records obtained from JPMorgan Chase, Wells Fargo, and TD Bank, I have learned, among other things, the following regarding accounts during the time period of the allegations set forth herein:

a.   ARIEL PERALTA, the defendant, was the sole signatory on two bank accounts registered to Carlyle, that is, a TD Bank account ending in -9336 (the "Carlyle TD Bank Account") and a Wells Fargo account ending in -2839 (the "Carlyle Wells Fargo Account").

b.   JOSEPH MCGOWAN, the defendant, was the sole signatory on two bank accounts registered to Vanguard Business Consultants, that is, a TD Bank account ending in -8333 (the "Vanguard TD Bank 8333 Account") and a TD Bank account ending in -8341 (the "Vanguard TD Bank 8341 Account" and, collectively, the "Vanguard Accounts").

23.   Based upon my participation in Victim Interviews with two Carlyle Victims ("Victim-6" and "Victim-7"), and my participation in this investigation, I have learned, among other things, the following:

a.   Victim-6 was contacted by a salesperson ("Salesperson-1") at Carlyle, after which point Victim-5 hired Carlyle to set up a website for Victim-6 ("Website-1"). According to Salesperson-1, Victim-6 would earn money through the operation of Website-1.

b.   Victim-6 opened Discover, Capital One, and Chase credit card accounts and sent cash advances for the maximum amount on each credit card account to Carlyle to fund

Website-1.  Victim-6 opened these credit card accounts and sent these cash advances at Carlyle's direction.

        c.   Victim-6 sent approximately a total of $20,000.00 to Carlyle.

        d.   Victim-6 never earned any money from operating Website-1.

        e.   On or about August 25, 2016, August 31, 2016, and September 7, 2016, at law enforcement's direction, Victim-6 placed several consensually recorded phone calls to Carlyle employees in my presence.  During each call, Victim-6 sought to obtain information from Carlyle, including by asking whether Website-1 was generating income for Victim-6.  During each call, the Carlyle representative provided Victim-6 with information regarding traffic to Victim-6's website and Victim-6's potential clients.  During the August 31, 2016 and September 7, 2016 calls, the Carlyle representative told Victim-6 that he would provide a status report to Victim-6's via email regarding any income generated and the analytics of Website-1.  Victim-6 never received such a report.

        f.   Victim-7 was contacted by a salesperson at Carlyle ("Salesperson-2") as early as 2014 regarding an investment opportunity.

        g.   Victim-7 invested money with Carlyle to build a website ("Website-2") that Victim-7 was told would earn money if Victim-7 purchased web traffic services.

        h.   Victim-7 opened Bank of America, Barclays, and Discover credit card accounts to send Carlyle cash advances to fund Website-2, and sent approximately $8,000.00 to Carlyle in total.  Victim-7 also sent checks totaling approximately $5,000.00 to Carlyle.

        i.   Victim-7 has not earned any money from Website-2.

        j.   On or about July 21, 2016, at law enforcement's direction, Victim-7 placed several consensually recorded calls to Carlyle salespersons in my presence.  During one call, a salesperson ("Salesperson-3") told Victim-7, in sum and substance, that if Victim-7 made an additional investment with Carlyle including improvements to Website-2, Victim-7 could double Victim-7's money in thirty days.  Salesperson-3 directed

Victim-7 to send a check for $5,000 to a suite at an address on West 34th Street, New York, New York (the "34th Street Address").

24.   Based on my conversations with other law enforcement officers at HSI who conducted open-source research into Website-1 and Website-2, and my review of bank records obtained from JP Morgan Chase and Wells Fargo, I have learned, among other things, the following:

a.   On or about August 1, 2016, HSI mailed a $2,500 check (the "Undercover Check") on behalf of Victim-7 to Carlyle at the 34th Street Address.

b.   The Undercover Check was deposited into the Carlyle Wells Fargo Account on or about August 4, 2016.

c.   In or about September 2016, HSI conducted open-source domain tool queries for Website-1 and Website-2. Based on my conversations with other law enforcement officers at HSI who conducted this research, I have learned that both Website-1 and Website-2 are hosted on HostGator, a provider of website hosting services, and neither Website-1 nor Website-2 have been modified since they were created.

d.   HostGator also hosts at least approximately 150 other websites made by Carlyle with domains registered via Google.  Each of these approximately 150 sites appear to have similar layout and many were almost identical in content and design to Website-1 and Website-2.

25.   Based on my participation in this investigation, my review of Website-1 and Website-2, and my review of certain of the other approximately 150 websites (the "Other Carlyle Websites"), I believe that the Other Carlyle Websites were created for victims of Carlyle.

26.   Based on my review of records provided by HostGator, I have learned, among other things, the following:

a.   Carlyle's website domains (collectively the "Carlyle Domains"), are hosted by HostGator;

b.   The registrant of the Carlyle Domains provided to HostGator the 34th Street Address;

     c.    The name associated with the credit card to which HostGator's fees for the Carlyle Domains are billed is "Carlyle Management GR – Ariel Peralta"; and

     d.    The identification provided for the registrant of the Carlyle Domains was a New York driver's license bearing the name "Ariel Peralta" and license number ending in -625 (the "New York Driver's License").

27.    Based upon my review of reports prepared by other law enforcement officers with HSI, I have learned that on or about August 23, 2016, ARIEL PERALTA, the defendant, was interviewed at Dallas/Fort Worth International Airport upon reentry to the United States by a Customs and Border Patrol Officer with U.S. Customs and Border Protection.  During that interview, PERALTA presented the New York Driver's License and stated, in substance and in part, that he is an employee of Carlyle and that Carlyle is headquartered at the 34th Street Address.

28.    Based upon my review of banking records obtained from Carlyle's TD Bank Account, including video surveillance, I have learned, in substance and in part, the following:

     a.    Several Victim checks were deposited into the Carlyle TD Bank Account, with the following Victims listed in the memo line of the check:

| Date | Amount | Victim |
| --- | --- | --- |
| April 8, 2016 | $6,220.00 | Victim-6 |
| April 11, 2016 | $2,375.00 | Victim-6 |
| May 3, 2016 | $3,795.00 | Victim-7 |
| May 9, 2016 | $1,850.00 | Victim-7 |
| June 2, 2016 | $9,995.00 | Victim-6 |

     b.    On multiple dates in May and June 2016, ARIEL PERALTA, the defendant, deposited several checks (the "Carlyle Checks" into the Carlyle TD Bank Account.  The Carlyle Checks, which ranged in amount from $695 to $9,995, totaled more than $150,000 over the two-month period, and most of them were deposited at a TD Bank branch in the vicinity of 32nd Street and 6th Avenue in New York, New York.  Based on my participation in this investigation, the fact that the Carlyle Checks were written largely by individuals, the amount of the individual Carlyle Checks, and the proximity of the location of the deposits to the 34th Street Address, I believe the Carlyle Checks were checks from Carlyle Victims.

c.    Between in or about May 2016 and in or about June 2016, PERALTA made a cash withdrawal from the Carlyle TD Bank Account on at least 24 separate occasions, each in the amount of $4,000.

29.   Based on my review of banking records from the Carlyle TD Bank Account, the Carlyle Wells Fargo Account, and the Vanguard Accounts, I have learned among other things, the following:

a.    Carlyle wrote checks to JOSEPH McGOWAN, the defendant, totaling at least $26,894.00 between in or about February 2016 and in or about June 2016.

b.    Large cash deposits were made into the Vanguard Accounts on at least six days when PERALTA made a $4,000 cash withdrawal from the Carlyle TD Bank Account, as set forth below:

| Account | Transaction | Date | Time | Amount |
|---------|-------------|------|------|--------|
| Carlyle TD Bank | Withdrawal | 5/12/2016 | 11:08 AM | $4,000 |
| Vanguard TD Bank | Deposit | 5/12/2016 | 4:38 PM | $4,000 |
| Carlyle TD Bank | Withdrawal | 5/31/2016 | 11:05 AM | $4,000 |
| Vanguard TD Bank | Deposit | 5/31/2016 | 2:23 PM | $3,000 |
| Carlyle TD Bank | Withdrawal | 6/6/2016 | 10:10 AM | $4,000 |
| Vanguard TD Bank | Deposit | 6/6/2016 | 2:25 PM | $2,500 |
| Carlyle TD Bank | Withdrawal | 6/9/2016 | 10:24 AM | $4,000 |
| Vanguard TD Bank | Deposit | 6/9/2016 | 4:40 PM | $2,000 |
| Carlyle TD Bank | Withdrawal | 6/16/2016 | 9:17 AM | $4,000 |
| Vanguard TD Bank | Deposit | 6/16/2016 | 6:11 PM | $1,500 |

30.   Based upon my review of records from the Carlyle TD Bank Account, I have learned that on or about July 25, 2016, $150.00 was withdrawn from the Carlyle TD Bank Account. Based upon my review of the surveillance video of this transaction, and a review of a photograph of JOSEPH McGOWAN, the defendant,

taken by the New Jersey Motor Vehicle Commission for the purposes of issuing him a driver's license, I believe that the withdrawal from the Carlyle TD Bank Account was made by McGOWAN.

31.   Based on my training, experience, and participation in this investigation, the transfers of funds described supra ¶¶ 28(a) coupled with his ability to withdraw funds from Carlyle's bank account likely reflect McGOWAN's role as a partner of Carlyle.

32.   Based on my interview with two Victims of Vanguard ("Victim-8" and "Victim-9"), I have learned, among other things, the following:

a.   Victim-8 and Victim-9 each received calls in approximately 2015 from a representative of Vanguard.  Both Victim-8 and Victim-9 were encouraged to purchase a website to start a home-based business that would generate income without any effort by Victim-8 or Victim-9.

b.   Victim-8 paid Vanguard approximately $25,000 via check and cash advances on credit cards.  Based upon my review of bank records obtained from TD Bank, I have learned that, on or about July 11, 2015, Victim-8 wrote a check to Vanguard in the amount of $4,800.  Victim-8 was promised "coaching" sessions as part of the home-based business, but Victim-8 did not receive those sessions.

c.   Victim-9 agreed to invest with Vanguard, and wrote Vanguard a check for $9,995, which was deposited into the Vanguard TD Bank 8333 Account.

d.   Victim-9 also opened credit card accounts with Discover and Chase and paid Vanguard for the website using cash advances.  Victim-9 incurred approximately $15,000 in debt on these credit cards.

e.   Victim-9 called representatives of Vanguard on several occasions to complain and seek a refund.  Vanguard has not returned Victim-9's phone calls.

33.   Based upon my review of email communications involving WILLIAM SINCLAIR and JOSEPH McGOWAN, the defendants, Vanguard also appears to exchange Lead Lists and discuss the Telemarketing Scheme with Olive Branch.  For example, on or about March 10, 2015, McGOWAN emailed SINCLAIR attaching a spreadsheet of names, addresses, email addresses, telephone

$5,000 to $32,000.  In the body of the email, McGOWAN wrote, in part, "We got these last week.  30 total.  My guys said right off the bat 15 were cancelled already.  We barely pulled shit.  And he said if we did good on them we would have gotten them first pass.  Ball park what do u think u would pulled [sic] from this if half were cancelled already when you got this list."  Based upon my experience, training, and participation in this investigation, I believe McGOWAN was asking for SINCLAIR's view as to how many of the 30 leads McGOWAN should have expected to result in a sale given 15 of the 30 leads had already canceled the previous sales. By "pulled shit," I believe McGOWAN is saying he barely made any money on the leads.

        WHEREFORE, deponent prays that an arrest warrant be issued for ARASH KETABCHI, a/k/a "Zach Peterson," ANDREW OWIMRIN, a/k/a "Andrew Owens," a/k/a "Jonathan Stewart," WILLIAM SINCLAIR, MICHAEL FINOCCHIARO, a/k/a "Michael Foster," ARIEL PERALTA, and JOSEPH McGOWAN, the defendants, and that they be arrested and imprisoned or bailed, as the case may be.

CHRISTOPHER BASTOS
Detective, Task Force Officer
New York City Police Department/
Department of Homeland Security –
Homeland Security Investigations


Sworn to before me this
16th day of March, 2017

THE HONORABLE BARBARA C. MOSES
United States Magistrate Judge
Southern District of New York